PAYNE et al. v. KANSAS & A. VAL. R. Co.

(Circuit Court, W. D. Arkansas. June 22, 1891.)

1. INJUNCTION—PRACTICE.
   The court, in determining the question of granting a temporary restraining order or a perpetual injunction, is governed solely by the laws of congress, the rules of the supreme court regulating equity practice, and the general rules of procedure in equity cases applicable to the equity practice in the courts of the United States.

2. SAME—JURISDICTION—FEDERAL QUESTION.
   The court has jurisdiction of this case because it involves a federal question. The rights of the parties arise under a law of the United States, and involve the construction thereof.

3. SAME—TEMPORARY RESTRAINING ORDER.
   After the passage of the act of congress of 1793, and prior to the act of June 1, 1872, a temporary injunction or restraining order could not be granted without notice to the adverse party. But by the seventh section of the act of congress of June 1, 1872, which is now section 718 of the Revised Statutes of the United States, if a bill is filed for an injunction, and a subpœna issued notifying a defendant to appear on a rule-day, and if in the mean time there is danger that irreparable injury may be committed, the court, in the exercise of a sound discretion, will issue a temporary restraining order without notice.

4. JURISDICTION IN EQUITY—ADEQUATE REMEDY AT LAW.
   By section 723 of the Revised Statutes of the United States, suits in equity will not be sustained in either of the courts of the United States in any case where a plain, adequate, and complete remedy may be had at law. This section of the statute is merely declaratory, and made no change in the pre-existing law. It serves merely to emphasize the rule already existing.

**5. SAME—CONTINUED TRESPASS.**

If the remedy at law is not as plain, adequate, and complete as one obtainable in equity in case of a continued trespass, the party may prevent the injury by injunction, rather than wait until it is done, and then look for his damages in a court of law.

**6. SAME.**

To bar equitable relief the legal remedy must be equally effectual with the equitable remedy as to all the rights of a complainant. Where the remedy at law is not as practicable and as efficient to the ends of justice, and its prompt administration, the aid of equity may be invoked.

**7. INJUNCTION—RESTRAINING IRREPARABLE DAMAGE.**

The courts will interfere by injunction to prevent wrongs of a repeated and continued character, but which occasion damages which are estimable only by conjecture, and not by an accurate standard; that this is what is meant by irreparable damages or mischief, when we use the expression in connection with an application for an injunction. If the damage is irreparable, it presents a state of case where the party, in the sense of section 723 of the Revised Statutes of the United States, does not have a plain, adequate, and complete remedy at law; for, if he has such remedy, the damage is not irreparable.

**8. SAME—TAKING PRIVATE PROPERTY WITHOUT COMPENSATION.**

An attempt by a railroad company to build its road upon private property without payment of compensation may be prevented by injunction.

**9. SAME—EASEMENTS.**

The lands taken by defendant in this case were taken *in invitum*, and defendant only acquired an easement to the land, and only such a one as the act of congress authorized. If the use of the lands of plaintiffs for an approach for a wagon-road and foot bridge is a use not authorized by congress, and it injuriously affects the lands of plaintiffs, then it is a new and unauthorized use, which, because it injuriously affects their lands, becomes a supervening servitude, which amounts to a taking of their property, and for which taking they are entitled to compensation.

**10. EMINENT DOMAIN—COMPENSATION.**

Private property, under the constitution of the United States, can be taken for public use only with just compensation.

**11. SAME—PURPOSE OF TAKING—EXTENSION.**

A use beyond the purpose of a first condemnation of land by right of eminent domain cannot be included in the first use if not authorized by law to be so included, and such use creates a new servitude if it casts on the land already condemned an additional burden. If such second use affects the value of said land to an extent to which it was not affected by the original taking, then it subjects the land to a new servitude, and there is a taking of private property which has not been paid for.

**12. SAME.**

When private property is taken for public use the owner is entitled to full compensation, which means the fair market value of the property at the time of the taking.

**13. SAME—ESTIMATE OF DAMAGE.**

In estimating the value of the lands of plaintiffs, situated as they are shown to be, the fact that they possess peculiar advantages as a site for a ferry-landing may be allowed in the estimation of the market value of the land. Plaintiffs have a right to insist on this fact as an element that goes to make up the value.

**14. SAME—ADDITIONAL USE.**

If the additional use sought to be fastened on the land of plaintiffs by the construction of a wagon and footway bridge by defendant necessarily injures its value as a ferry-landing, then there is, for this reason, an additional servitude cast on the land, for which plaintiffs are entitled to additional pay.

**15. SAME—EXERCISE OF POWER.**

In this case the land condemned under the act of congress of June 1, 1886, could be condemned but for one purpose, and that was for use as a right of way for a railway and a railway bridge. The condemnation of private property for public use must be to subserve the use authorized, and the power of condemnation can only be exercised when expressly granted, or when it exists by necessary implication, and it must be exercised in the manner granted.

**16. CHEROKEE NATION—TITLE TO LAND.**

The Cherokee nation holds the fee to all the lands to which it has title. Individual citizens of the nation have a right of perpetual occupancy in lands improved and occupied by them under the laws of the Cherokee Nation. By this right of occupancy the individual Indian citizen can hold and occupy the lands forever, and fully enjoy all profits arising from them, and their right of occupancy may be trans-

ferred by a grant to another citizen of the nation, or it may descend by inheritance. Practically they get all of the productions of the land, and are entitled to its increased or peculiar value as though they held it in fee.

17. SAME—RIGHT TO COMPENSATION.
The Cherokee citizen and occupant of land has such a durable and permanent interest in his land as to entitle him to pay for an additional servitude cast on the same.

18. EMINENT DOMAIN—ADDITIONAL SERVITUDE—COMPENSATION.
The use of lands already condemned for use as a right of way for a railway and railway bridge, for approaches for a wagon and foot-passenger bridge, is not a use for railway purposes, and is not one authorized by such first condemnation; and, before the same can be used for approaches for a wagon and footway bridge, if such use in any way casts an additional burden on said land, it must be condemned again by right of eminent domain, and this can only be done when authorized by the legislative power. In this case no such authority exists, either expressly or by necessary implication.

*(Syllabus by the Court.)*

In Equity.

*Rogers & Read*, for plaintiffs.

*Dodge & Johnson, D. W. Jones,* and *C. B. Moore, (Clayton, Brizolara & Forrester,* of counsel,) for defendant.

PARKER, J. The plaintiffs filed their bill in equity to obtain an injunction against the defendant. They allege that the defendant corporation, by virtue of an act of congress entitled "An act to authorize the Kansas & Arkansas Valley Ry. Co. to construct and operate a railway through the Indian Territory, and for other purposes," approved June 1, 1886, were invested and empowered with the right of locating, constructing, owning, equipping, operating, using, and maintaining a railway and telegraph and telephone line through the Indian Territory, beginning at a point on the eastern line of said territory, at or near the city of Ft. Smith, in the state of Arkansas; thence running, by the most feasible and practicable route, in a north-westerly direction, through the Indian Territory, between the Arkansas river and Cowley county, and the Caney river, in Chautauqua county, Kan., as said corporation may select; and also another branch line, which is not relevant to the issues involved in this case, "with the right to construct, use, and maintain such tracks, turn-outs, and sidings as said company may deem it their interest to construct along and upon the right of way and depot grounds herein provided for." That by the second section of said act said corporation was "authorized to take and use for all purposes of a railway, and for no other purpose," a right of way 100 feet in width through said Indian Territory, for said main line and branch of said corporation, and—

"To take and use a strip of land 200 feet in width, with the length of three thousand feet, in addition to the right of way, for stations, for every 10 miles of road, with the right to use such additional grounds, where there are heavy cuts or fills, as may be necessary for the construction and maintenance of the road-bed, not exceeding 100 feet in width on each side of said right of way, or as much thereof as may be included in such cut or fill: provided, that no more than said addition of land shall be taken for any one station: provided, further, that no part of the lands herein authorized to be taken shall be leased or sold by the company, and they shall not be used except in such manner and for such purpose only as shall be necessary for the construction and convenient

operation of said railroad, telegraph, and telephone lines; and, when any portion thereof shall cease to be so used, such portion shall revert to the nation or tribe of Indians from which the same shall have been taken."

—That the third section of said act provided a method for the condemnation of said right of way, and provided that full compensation should be paid the occupants of the right of way by the railway company before its road should be constructed for "all property to be taken or damage done by reason of the construction of such railway." That by virtue of the said act of congress the said defendant proceeded to locate and construct its roads. That defendant now has a large portion of said road in operation. That the road is constructed down to a point on the Arkansas river opposite to Ft. Smith, in the state of Arkansas, where said defendant now has in progress of construction, and almost completed, a railway, passenger, and wagon bridge across the Arkansas river. The bill further alleges that for several years last past the plaintiffs have been the owners and individual occupants, and as such have held, and now hold and occupy, the land in the Cherokee Nation opposite the city of Ft. Smith for several hundred yards both above and below the point where said bridge is located, and extending back several hundred yards from the bank of said river in said Cherokee Nation, and on both sides of said railway. That heretofore the said defendant, under the provisions of the said act of congress, condemned a right of way 100 feet wide through said lands of plaintiffs, as described in said bill of plaintiffs; for a railway bridge, and for railway, telegraph, and telephone purposes, and for no other purpose. That defendant has been in the quiet, undisturbed, and peaceful possession of said right of way ever since. That, long after said lands were condemned for the purposes aforesaid, the defendant conceived the idea in constructing the bridge hereinbefore described of converting it to or making it a passenger and wagon bridge. That the defendant secured the passage of another act of congress entitled "An act to authorize the construction of a bridge over the Arkansas river, in the Indian Territory," approved March 15, 1890. That said act of congress provided, among other things—

"That the Kansas & Arkansas Railway Co., a corporation organized and existing under the laws of the state of Arkansas, and being empowered by act of congress approved June 1, 1886, to construct its railway from a point on the eastern boundary line of the Indian Territory at or near Ft. Smith, Arkansas, through said territory, in a north-west direction, to a point on the northern boundary line of said territory, with the power to build a branch as therein provided, the construction and operation of which said line of railway involves the construction of a bridge across the Arkansas river, in the Indian Territory, from a point at or near Ft. Smith, be, and the said Kansas & Arkansas Valley Railway, its successors and assigns, are hereby, authorized and empowered to construct said bridge across said river, and to maintain and operate the same as a railway, passenger, and wagon bridge."

The act further provides that the rates of toll which shall be charged for vehicles and foot passengers over said bridge shall be the same as those now established for like service by the laws of Arkansas. The bill further alleges that under and by virtue of the last-named act said bridge

has been constructed as a railway, passenger, and wagon bridge. That said act, authorizing the construction of a passenger and wagon bridge, gave no authority to defendant to take, use, and condemn property for approaches to said bridge, nor under it can the defendant use the right of way obtained under the act of June 1, 1886, for approaches of the road-way for wagons and passengers to its said bridge. The plaintiffs further state that they not only hold the land hereinbefore described as individual occupants, according to the laws, customs, and usages of the Cherokee Nation, but that the ferry privilege across the Arkansas river at Ft. Smith, Ark., attaches to said land, and that they have the license and exclusive right from the Cherokee Nation to run a ferry across that river from the Cherokee side at that point, and are now, and have been for years, interested in running a ferry at that point for the crossing of passengers, wagons, stock, and general travel for hire. That they have a large amount of money invested in said ferry. That defendant is now grading and constructing on its said right of way, condemned, as aforesaid, approaches for a wagon-way and footway to its said bridge for the accommodation of wagons, passengers, and general travel, and has begun to construct approaches on plaintiffs' land on both sides of said road, not on its right of way. That said approaches on said right of way are now rapidly approaching completion, and will be completed and used for the purposes aforesaid unless defendant is restrained by this court. The plaintiffs further state that the construction of said road-way on said bridge for passengers and footmen, and other general travel on the right of way of defendant, constitutes an additional burden on the lands of plaintiffs. That the same is unauthorized by the charter of defendant, and the same is in violation of law. That the opening of said bridge and the construction of the passenger and wagon way over the right of way of defendant, or over plaintiffs' lands, adjacent thereto, will utterly destroy the value of the ferry privilege attached to said land. The plaintiffs pray that defendant be perpetually restrained and enjoined from further constructing or grading of approaches or road-ways to its passenger or wagon bridge for the use or convenience of wagons, passengers, cattle, or other stock either upon or along their said right of way, or upon or over the lands held and owned by plaintiffs adjacent to said right of way. That defendant be restrained from using, and that it do not suffer or permit said grading along, its right of way, where the same runs through the lands of plaintiffs, except for the purposes for which the same was condemned. The plaintiffs pray a temporary restraining order.

The court, upon the showing made in the bill, issued such temporary restraining order, and also a subpœna giving notice to defendant to appear on the next rule-day of this court, and plead to or answer the bill of plaintiffs. The defendant, by its counsel, filed a demurrer to the bill, and for cause thereof said:

"(1) That said bill fails to set up facts sufficient to constitute a good cause of action against this defendant. (2) That said bill fails to set up facts sufficient to constitute a cause of action for equitable relief against this defend-

ant.   (3) There is no equity in said bill.   (4) That plaintiffs have full, complete, and adequate remedy at law by reason of any damages or injury suffered as alleged in said bill."

At the same time defendant filed its motion to dissolve the temporary injunction heretofore granted in the case, for the reason—

"(1) That said writ of injunction was issued without any notice of any kind whatever made or had upon this defendant.   (2) The granting of the same without notice was in violation of section 3738 of Mansfield's Digest, which, by act of congress approved May 2, 1890, was extended over and made the law of the courts having jurisdiction in the Indian Territory.   (3) The granting of said injunction without notice was in violation of equity rule 55, governing United States courts in all equity proceedings.   (4) Because the acts of the defendant in the premises in no manner worked an irreparable injury or wrong against plaintiffs.   (5) Because defendant did not begin nor attempt to build approaches to its bridge for foot passengers and wagon-way either on the land of plaintiffs or off of its right of way upon lands belonging to any one else.   (6) Because the plaintiffs have a full, complete, and adequate remedy at law, if the defendant, as alleged, is guilty of any trespass upon their rights, land, or other property.   (7) Because said bill fails to set up facts sufficient, or any facts at all, which entitle the complainant to the interposition of a court of equity.   (8) Because there is no equity in said bill entitling complainants to a writ of injunction or other equitable relief, as prayed for in said bill."

By agreement the demurrer and motion to dissolve were heard by the court at the same time.

The first question to be considered is whether the temporary injunction should be dissolved because there was no notice given to the defendant of an application for the same before the same was granted.   It is manifest that the court, in determining the question of granting a temporary injunction in this case, is not governed by the statute law of the state of Arkansas that may have been, by an act of congress, extended over the Indian country; but it is governed solely by the laws of congress, or the rules of the supreme court regulating equity practice, and the general rules of procedure in equity cases applicable to the equity practice in the courts of the United States.   It may be remarked that this court does not have jurisdiction of this case because of the extension of the laws of Arkansas over the Indian Territory by the act of congress of May 2, 1890, but it has jurisdiction because there is involved in it a federal question.   The rights of the parties litigant necessitate the construction of an act of congress.   The rights of the parties arise under a law of the United States, and involve the construction thereof.   Under the clause of the act of congress of 1793, which provided: "Nor shall a writ of injunction be granted in any case without reasonable previous notice to the adverse party or his attorney of the time and place of moving the same,"—a temporary injunction or restraining order could not be granted without notice to the adverse party.   But the part of the act of 1793 as above set out has been repealed by section 7 of the act of June 1, 1872.   This section is now section 718 of the Revised Statutes of the United States, which is as follows:

"Whenever notice is given for a motion for an injunction out of a circuit or district court, the court or judge thereof may, if there appears to be danger of irreparable injury from delay, grant an order restraining the act sought to be enjoined until the decision upon the motion; and such order may be granted with or without security, in the discretion of the court or judge."

As the rule of equity practice is now established by the above section of the law, if a bill is filed for an injunction, and a subpœna is issued notifying the defendant to appear on a rule-day, and if, in the mean time, there is a danger that an irreparable injury may be committed, the court, in the exercise of a sound discretion, will issue a temporary restraining order without notice. *Chicago, B. & Q. Ry. Co.* v. *Burlington, C. R. & N. Ry. Co.*, 34 Fed. Rep. 481; *Central Trust Co.* v. *Wabash, St. L. & P. Ry. Co.*, 25 Fed. Rep. 1. By the allegations in this bill the injury complained of would have been fully sustained before a hearing could be had in the case, and therefore, if the party is entitled to an injunction to prevent the injury, without power in the court to temporarily restrain, it would be useless to him when he obtained the same. The point that no notice was given of the temporary restraining order is not, in my judgment, well taken in this case.

The defendant, in its motion to dissolve the injunction, for further cause thereof, states that its act in no manner worked an irreparable injury or wrong against plaintiffs, and that they have a full, complete, and adequate remedy at law, if defendant is guilty of any trespasses upon the rights of plaintiffs, their lands or other property. These allegations go to affect the equity jurisdiction of the court, to which the right to issue an injunction belongs. By section 723 of the Revised Statutes of the United States, "suits in equity shall not be sustained in either of the courts of the United States in any case where a plain, adequate, and complete remedy may be had at law." This section of the statute "is merely declaratory, and made no change in the pre-existing law." *Lewis* v. *Cocks*, 23 Wall. 466. It served merely to emphasize the rule already existing. *New York, etc., Co.* v. *Memphis Water Co.*, 107 U. S. 214, 2 Sup. Ct. Rep. 279. If merely declaratory of the rule then existing, if we can find, from interpretations of the rules fixing equity and law jurisdiction by the courts of the country, when equity will take jurisdiction, we will have a rule for our guidance which we can safely follow. In *Lewis* v. *Cocks*, 23 Wall. 470, the supreme court of the United States said:

"To bar equitable relief the legal remedy must be equally effectual with the equitable remedy as to all the rights of the complainant. Where the remedy at law is not as practicable and efficient to the ends of justice and its prompt administration, the aid of equity may be invoked."

The same court, in *Kilbourn* v. *Sunderland*, 130 U. S. 514, 9 Sup. Ct. Rep. 594, says:

"The jurisdiction in equity attaches unless the legal remedy, both in respect to the final relief and the mode of obtaining it, is as efficient as the remedy which equity would confer under the same circumstances."

It seems to need but a moment's reflection to satisfy the mind that equity, in a case of this kind, is more efficient to secure the ends of justice, and its prompt administration, than law; that greater justice can be more promptly secured by an appeal to equity, that the wrong may be stopped in its inception, rather than compel the injured party, or the party about to be injured, to wait until all the wrong is done, and then drive him to his action at law to get damages in reparation of wrong of a repeated and continuing character, when the amount of damages is estimable only by conjecture, and not by any accurate standard. Mr. Pomeroy, in his Equity Jurisprudence, (section 1357, vol. 3,) says:

"Judges have been brought to see, and to acknowledge, contrary to the opinion of Chancellor KENT, that the common-law theory of not interfering with persons until they shall have actually committed a wrong is fundamentally erroneous; and that a remedy which prevents a threatened wrong is, in its essential nature, better than a remedy which permits a wrong to be done, and then attempts to pay for it by the pecuniary damages which a jury may assess."

In *Com.* v. *Railroad Co.*, 24 Pa. St. 159, the supreme court of that state, in a most able opinion, declares that the courts will interfere by injunction to prevent wrongs of a repeated and continued character, but which occasion damages which are estimable only by conjecture, and not by any accurate standard, and that this is what is meant by irreparable damages, or mischief, in injunction cases. If this be so, then, when a state of case of that description exists, the damage is regarded as irreparable; and, if irreparable, it must be of a kind for which a party does not have a plain, adequate, and complete remedy at law, for, if he has such remedy at law, the damage is not irreparable. If the remedy at law is not as plain, adequate, and complete as one obtainable in equity in case of a continued trespass, the party may prevent the injury by injunction, rather than wait until it is done, and then look for his damages in a court of law. High, Inj. § 702, says:

"It is frequently a matter of difficulty to determine what constitutes such a degree of irreparable injury as to warrant a court of equity in enjoining what might otherwise seem to be an ordinary act of trespass, for which an adequate remedy at law might be found. * * * When the trespass complained of is repeated or continued, in the nature of a nuisance, or when the wrongful acts continued, or threatened to be continued, may become the foundation of adverse rights, and occasion a multiplicity of suits to recover damages, the case presents such equitable features as to entitle complainant to the aid of an injunction. So, too, a trespass which is continued, and will ripen into an easement, may properly be enjoined."

Mr. Foster, in his Federal Practice, (section 215,) says that—

"Injunctions to restrain trespasses are only granted when the trespass is destructive or continued. * * * An attempt by a railroad company to build its road upon private property without payment of compensation may be thus prevented."

Again, at section 210, he says it may be granted "to suppress the continuance of a public or a private nuisance; to prevent a threatened destructive trespass." A private nuisance is anything done to the hurt of

the lands or tenements or hereditaments of another; anything that unlawfully worketh hurt or inconvenience or damage. 3 Bl. Comm. 215, 216; 2 Bouv. Dict. 245. Whatever annoys or does damage to another is a private nuisance. And. Law Dict. 717. Thus we see a private nuisance, as thus defined, may be prevented or suppressed by an injunction. "In a case where private property has been taken by a railroad company without condemnation by such company, the remedy in equity in the shape of an injunction protects both the owner and those acting under the authority, and is more speedy and efficacious in its operation than the ordinary legal remedy." Section 632, Lewis, Em. Dom. In *Browning* v. *Railroad Co.*, 4 N. J. Eq. 47, the chancellor held: "If a R. R. Co. claim a right to enter upon land under color of law without having complied with the requirements of that law, a court of equity will restrain their entry by injunction." In the case of *Bonaparte* v. *Railroad Co.*, 1 Baldw. 229, the court, in treating of the remedy says:

"If his rights of property are about to be destroyed without the authority of law, or if lawless danger impends over them by persons acting under color of law, when the law gives them no power, or when it is abused, misapplied, exceeded, or not strictly pursued, and the act impending would subject the party committing it to damages in a court of law for a trespass, a court of equity will enjoin its commission."

In *Railroad Co.* v. *Owings*, 15 Md. 199, the court held "that a R. R. Company may be enjoined from constructing its road without authority over private property, for the use of which it has not paid or tendered compensation, whether or not the injury is irreparable." In *Bird* v. *Railroad Co.*, 8 Rich. Eq. 46, the court held that—

"An injunction will be granted where the act complained of is attended with permanent results, destroying or materially altering the estate, or where defendants are attempting to make permanent appropriation of land admitted or proved to belong to plaintiff, and the license or warrant of the defendant to encroach upon it is deemed doubtful by the court. That a R. R. Company will be enjoined from appropriating land admitted or proved to belong to a plaintiff, when not authorized to do so by its charter."

These principles affecting equity jurisdiction are generally sustained by the English equity courts. This is the source of our chancery jurisdiction. The American chancery courts are generally as clear and explicit as are the English chancery courts in sustaining chancery jurisdiction in cases such as I have referred to. This is the rule as to jurisdiction that is simply declared by section 723 of the Revised Statutes of the United States. The doctrine of the above cases is fully sustained by the case of *Griffing* v. *Gibb*, 2 Black, 519. This was a case where an injunction was prayed to prevent injury to a city lot in San Francisco. The case of *Eidemiller* v. *Wyandotte City*, 2 Dill. 376, is a case where an injunction was prayed to prevent the making of an embankment on a road that had been laid off through the land of plaintiff; but the same had not been condemned and paid for. It was objected by the defendant that the complainants are not entitled to an injunction, because the injury complained of was not irreparable, and because they have a full and adequate remedy at law. In reply to this Judge DILLON said:

"I deem it unnecessary to follow the counsel in their discussion. The making of a high embankment of great width and length, to be used as a public road-way, falls, I think, within the legal notion of an irreparable injury, and gives a clear and recognized right to an injunction."

The same principle is recognized in *Northern Pac. R. Co.* v. *St. Paul, M. & M. R. Co.*, 1 McCrary, 302, 3 Fed. Rep. 702. There can, I think, be no doubt of the right of plaintiffs to an injunction, provided they have any equity growing out of any injury to a right they may possess. The defendant asserts that "there is no equity in said bill entitling complainants to a writ of injunction, or other equitable relief prayed for in the bill." This depends on the right or interest plaintiffs may have remaining in the property, which has, by right of eminent domain, been taken in accordance with law, and paid for, to be used for a specific purpose, and no other; for using for any other purpose was expressly prohibited by act of congress of June 1, 1886. Section 2 declares "that said corporation is authorized to take and use for all purposes of a railway, and for no other purpose, a right of way," etc. The same section further provides that the lands herein authorized to be taken "shall not be used except in such manner and for such purpose only as shall be necessary for the construction and convenient operation of said railroad, telegraph, and telephone lines." If any other use than for railroad purposes would cast an additional burden on the land of plaintiffs, the same could not be used for any other purpose than that for which it was condemned, unless express authority, or authority by necessary implication, was given, authorizing condemnation for such additional use. We do not find in this case any such authority given as would authorize the use of the right of way for any other than railroad purposes, but, on the contrary, we find such use expressly prohibited by the act of congress of June 1, 1886. It was under this act of congress that the right of way was condemned, upon the application of defendant, and the same was paid for as condemned by it. This power, granted by this act of congress, must be exercised for the purpose for which the power was granted, and for no other purpose; for lands acquired by corporations for a specified purpose cannot be used for others. Green's Brice, Ultra Vires, pp. 104, 109–112; *Imlay* v. *Railroad Co.*, 26 Conn. 255; *Telegraph Co.* v. *Smith*, 18 Atl. Rep. 910. The land taken by defendant in this case, under the act of congress of June 1, 1886, was taken *in invitum*, and defendant only acquired an easement to it, and such easement as the act of congress authorized. But does the use of the railroad right of way by defendant for the purpose of building a wagon and passenger bridge subject the land of plaintiffs to a new use which injuriously affects the same? If it is a new use which does not injuriously affect the value of their land, then their estate in such land is not injuriously affected by the supervening servitude, and there is not a taking of their property. In every case where there is a taking of private property for public use it must be with just compensation. Article 5, Amendment to the Constitution of the United States. What is meant by the taking of private property, or, rather, what is meant by an additional taking? There has been one tak-

ing by the defendant. Was the use of its railroad right of way for the approaches of a wagon and passenger bridge an additional taking? Mr. Elliott, in his work on Roads and Streets, 155, says if there is a—

"Subjection of the land to an easement, or any other burden incompatible with the dominion of the owner, or the serious interference with the use or the enjoyment of the property, it will be deemed a taking, within the meaning of the organic law. An incident annexed to land may be of value, and to wrest such a thing from the owner for a public use is to take from him his property. The term 'property' is by no means limited to land itself, but embraces all the incidents which give value to the owner, and includes the right which pertains to the ownership of things real and personal; and, whenever there is a direct and substantial invasion of these rights, there is a taking, in the constitutional sense, conferring upon the owner a right to compensation."

The supreme court of the United States in *Pumpelly* v. *Green Bay Co.*, 13 Wall. 166, says—

"That it remains true that where real estate is actually invaded by superinduced additions of water, earth, sand, or other material, or by having any artificial structure placed on it, so as to effectually destroy or impair its usefulness, it is a taking, within the meaning of the constitution."

—And, as a matter of course, one that gives the owner a right to additional compensation, because his land, if the additional burden is cast upon it, is again taken for public use, and he is entitled to additional compensation, although the land may have been taken and paid for, if paid for a use other than the one for which it is taken the second time, as whatever use was contemplated in the original condemnation, and the damages resulting therefrom are the damages and use included in the assessment therefor. But a use beyond the purpose of that condemnation, and which could not, for the want of legal power, be included in it, would be a new use, and would create a new servitude, if it cast any additional burden on the lands of plaintiffs, or on the right of way already condemned for a specific purpose. The question then presents itself, does this use of the right of way of defendant, already condemned for railroad purposes, for the approaches to the wagon and footway part of its bridge, under the above rule laid down, cast any additional burden on the adjacent land of plaintiffs? If such use affects the value of such property to an extent to which it was not affected by the original taking, then it is subjected to a new use, which creates an additional burden upon its owner, and which subjects the land to a new servitude, and consequently there is a taking of private property for public use, which has not been paid for. The proof submitted in this case shows that plaintiffs are the owners by right of perpetual occupancy of the lands on either side of the approaches to the wagon and footway part of the bridge for several hundred yards back of the river on the Cherokee side of it; that the same is the river front at the above-named point; that there is now, and has been for many years, a ferry owned in part by plaintiffs, used by them in crossing wagons, foot passengers, and live-stock of all kinds for hire over the Arkansas river; that said ferry now lands, and has for many years landed, on the Cherokee side of the river on the lands owned by plaintiffs; that

the same have a peculiar **value** because of their being particularly adapted to use as the site of a ferry-landing.   The plaintiffs show the existence of the ferry, and its landing on their lands, to prove the eligibility of the same as a ferry-landing.   Can this fact be taken into consideration in assessing the value of these lands?   And are they rendered less valuable for use as a ferry-landing by the building of the bridge as a wagon and footway bridge?   When private property is taken for public use, the owner is entitled to full compensation, which means the fair market value of the property at the time of the taking.   In *Boom Co.* v. *Patterson,* 98 U. S. 408, the supreme court of the United States says:

"The inquiry in such cases must be, what is the property worth in the market, viewed, not merely with reference to the uses to which it is at the time applied, but with reference to the uses to which it is plainly adapted?   That is to say, what is it worth from its availability for valuable uses?   Property is not to be deemed worthless because the owner allows it to go to waste, or to be regarded valueless because he is unable to put it to any use.   Others may be able to use it, and make it subserve the necessities or conveniencies of life.   Its capability of being made thus available gives it a market value which can be readily estimated.   So many and various are the circumstances to be taken into account in determining the value of property condemned for public purposes that it is perhaps impossible to formulate a rule to govern its appraisement in all cases.   Exceptional circumstances will modify the most carefully guarded rule; but, as a general thing, we should say that the compensation to the owner is to be estimated by reference to the uses for which the property is suitable, having regard to the existing business or wants of the community, or such as may be reasonably expected in the future."

In the case of *Railway Co.* v. *Woodruff,* 49 Ark. 381, 5 S. W. Rep. 792, the supreme court of Arkansas fully recognized the above rule, and held that, in estimating the value of the land of Woodruff, the fact that such land had on it a site well suited for the landing of the end of a bridge might be taken into consideration in fixing the value of the same. The court further said: "In a proceeding to condemn a site for a railroad bridge, evidence to show that the land required for that purpose possessed peculiar advantages as a bridge site is admissible as affecting the question of its value."   In the case of *Railway Co.* v. *McGehee,* 41 Ark. 202, the land appropriated by the railroad company was worthless for habitation or cultivation, but its prospective value for a ferry-landing, to be established in the future, was allowed in the estimate of damages.   Under the above rule the adaptability of the lands of plaintiff for ferry-landing purposes is a circumstance that they have a right to insist upon as an element that goes to make up the market value of their lands.   If the defendant, by the construction of its wagon and footway bridge, necessarily injures the value of plaintiffs' lands, such value growing out of its adaptability as a ferry-landing, does it not take away this element of value?   If so, there is a burden cast upon the land by the defendant,— a servitude of such a character as to injure, if not largely destroy, its value.   If the act of defendant in building its railroad bridge did not affect this peculiar value of the lands of plaintiffs, and its building its footway and wagon bridge does affect such value, or if its building its

railroad did not as largely affect the value of such lands as does the building of its wagon and foot bridge, then, by such last-named act, there is most certainly a new servitude cast on the land, which affects its value.   The peculiar value of this land grows out of the fact that it is eligible as the site of a ferry-landing.   One of the elements that largely makes it so eligible for such purpose is that at that point on the river there is a ferry, with a large patronage from the people.   Take away that patronage, and it is scarcely any more eligible or valuable as the site of a ferry-landing than any other point on the river.   The building of the wagon and footway bridge will very largely destroy the patronage of the ferry, and in this way affect the value of the ferry-landing.   The building of the bridge as a railroad bridge only could not to this extent affect the value of the land, because the amount of patronage the railroad would take from the ferry would amount to scarcely nothing, and, in condemning the land for railway purposes alone, there would be no injury of this kind to take into consideration.   I think we can therefore see that it is clearly a new use,—a new servitude cast upon the land by the building of the wagon and foot bridge.   A property which has been condemned for public use under the right of eminent domain cannot be subjected, under such condemnation, to an additional charge, without another condemnation; for, when the public use has ceased, the property will then revert to the former owner.   Mills, Em. Dom. § 57.   Some evidence has been offered to show that the value of this land as a ferry-landing site was taken into consideration when the right of way for railroad purposes was condemned.   It could not be, as the building of the railroad or the railroad bridge could not materially affect the value of this land by the taking of patronage from the ferry, which has its landing on these lands, and thereby they are made more valuable.   Then the injury to them by the building of a wagon and footway bridge could not have been considered in the first condemnation, because defendant at that time had no authority to build such a bridge.   Under the act of congress of June 1, 1886, the land could be condemned but for one purpose, and that was the purpose of a railway; for this was taking private property for public use by the right of eminent domain, the exercise of a reserved sovereign power, and such power can only be exercised when the power is granted, and in the manner granted.   Lewis, Em. Dom. § 237.   The condemnation of private property for public use must be to subserve the use authorized.

We are not to consider any direct injury to the ferry franchise, but we may consider the existence of this franchise, and the fact that it is being used, and that a ferry is being run, which does a large business, and which on one side of the river has its landing on the land of plaintiffs, adjacent to the approach to the bridge, and for these reasons the land is made more valuable.   This is an evidentiary fact, to show the eligibility of this land for a particular purpose.   It is claimed that this additional burden can only be considered as affecting the interest of the holder of the fee of this land, the Cherokee Nation.   As between the holder of the fee and an ordinary tenant this is true, but these plaintiffs,

under the laws of the Cherokee Nation, hold this land in such a way as to give them the right of perpetual occupancy. The reason why additional damages, growing out of a new burden cast upon the property, goes to the owner of the fee is because the ordinary tenant is not likely to have an interest so durable as that it can be affected by this new charge cast upon the property. But if the party has such a perpetual interest in the property that it is manifest that the additional burden cast on it does injury to it, the reason of the rule ceases, and in justice a new principle should operate. While citizens of the Cherokee Nation do not have a fee to the lands they occupy, they can hold them forever, and fully enjoy the profits arising from them, and this right may be granted to their heirs, or may descend by inheritance. Practically they get all the productions of the land, the same as though they held it in fee. If there is any peculiar value to the land, it attaches to the right of possession, and the occupant gets the benefit of it. The plaintiffs have such a right to their lands as that they could resume possession of them whenever the original use for the purpose for which they were condemned shall be finally abandoned; and, while they do not hold the fee to the land, I think their interest is so great as to entitle them, as perpetual occupants, to compensation for the additional servitude cast upon their lands, for this additional servitude affects them more intimately and more effectively than it does the Cherokee Nation. The circuit court of the United States, in *Northern Pac. R. Co.* v. *St. Paul, M. & M. R. Co.*, 1 McCrary, 302, 3 Fed. Rep. 702, declares: "The open and acknowledged possession of a party is sufficient to maintain injunction to prevent such possession being disturbed by being taken for a R. R. right of way." I think this principle is justly applicable to the existing condition in this case.

The remaining question which was presented in argument is, has congress conferred upon defendant the power to condemn the property of plaintiffs for approaches for a wagon and footway bridge? As already declared, there is an additional taking of the property of plaintiffs, because there is, in addition to the easement already enjoyed by defendant, the subjection of the property to an additional servitude, which amounts to another taking; and, before there can be that taking by the defendant, there must be authority for it. The right of eminent domain in government is the right to take private property by an extraordinary method; extraordinary, because it does not involve the consent of the owner. Because it may thus be asserted against the individual citizen, the party asserting it must assert it by the authority of the law-making power, when given in express terms or by necessary implication. Lewis, Em. Dom. § 240, says: "The exercise of the power being against common right, it cannot be implied or inferred, but must be given in express terms or by necessary implication." When the act of congress authorizing the building of the wagon and footway bridge fails to make any provision for compensation, it is to be presumed that congress did not intend that the power of eminent domain should be exercised, but it contemplated that the right might be obtained by negotiation, by contract with the

owners. This principle is fully sustained in *Pennsylvania R. Co.'s Appeal*, 93 Pa. St. 150. Judge Dillon, in his able work on Municipal Corporations, (section 469,) says:

"Not only must the authority to municipal corporations or other delegated legislative agents to take private property be expressly conferred, and the use for which it is taken specified, but the power, with all constitutional and statutory limitations and directions for its exercise, must be strictly construed. Since the power to condemn private property against the will of the owner is a stringent and extraordinary one, based upon public necessity, or an urgent public policy, the rule requiring the power to be strictly construed, and the prescribed mode for its exercise strictly followed, is a just one, and should, within all reasonable limits, be inflexibly adhered to and applied."

The right of eminent domain is one which lies dormant in the state until legislative action is had pointing out the occasion, mode, conditions, and agencies for its exercise. *Dyckman* v. *City of New York*, 5 N. Y. 434; Cooley, Const. Lim. 527; *Allen* v. *Jones*, 47 Ind. 438.

The court in *Water-Works Co.* v. *Burkhart*, 41 Ind. 364, said: "No property can be taken for public use by condemnation or otherwise than by legislative authority, and in the manner and for the purposes authorized." These declarations of a legal principle are fully sustained by all the authorities on the subject.

It is claimed for the defendant that the act of congress of June 1, 1886, granting a right of way to the defendant for railroad, telegraph, and telephone purposes, and the act of congress of March 15, 1890, authorizing the construction of defendant's bridge across the Arkansas river, at Ft. Smith, as a wagon and footway bridge, are to be construed as laws *pari materia*. I think this is correct. But by such construction we cannot evolve from these acts of congress the power to condemn the property of plaintiffs, unless such power, expressly or by necessary implication, exists in one or the other of these acts, and unless the purpose of the exercise of such power is to be found, expressly or by necessary implication, in one or the other of them. Does it so exist? As we have already seen, by the act of June 1, 1886, the defendant was authorized to take property and use the same for all purposes of a railway, and for no other purpose,—a right of way, etc.; and the section further provides that the lands taken "shall not be used except in such manner and for such purposes only as shall be necessary for the construction and convenient operation of said railroad, telegraph, and telephone lines." Use of the lands for approaches of a wagon and footway bridge is not use for railroad, telegraph, or telephone purposes. The use for railway purposes alone is the use to which the land authorized to be condemned was limited by .the act of congress. Then there is no express authority to condemn for the use of a footway and wagon bridge in this act of congress, nor does it appear by necessary implication. But, on the contrary, a use of that kind, as well as all other uses, except for railway, telegraph, and telephone purposes, is expressly prohibited. In the act of March 15, 1890, authorizing the building of a footway and wagon part of the bridge, there is not a word on· the subject of the condemnation of pri-

vate property to be used in the construction of the bridge. There is therefore in this act no express authority to condemn, nor can it arise by necessary implication. If there is no authority in either act to do this thing, we cannot create an authority by construing the two acts as laws *pari materia.* If the authority does not exist in either of the acts, we cannot find its existence by putting them together. After a careful examination of these laws of congress, and all the authorities upon the condemnation of private property for public use, I have arrived at the conclusion that defendant has now no power to condemn the land of plaintiffs for use as an approach for a wagon and footway bridge; and to get the right, and use the same for such purpose, defendant must either go to congress for authority to exercise the right of eminent domain, or negotiate with plaintiffs for the use of the right of way as an approach to its wagon and footway bridge. It is in my judgment a matter of great regret that authority to condemn has not been given, as it works delay in the completion of a great thoroughfare, which will be an important agency in securing the development, progress, and prosperity of the country, and consequently of great and lasting benefit to the people. Yet when plaintiffs have a legal right, although it may be but a small one, when weighed in the balance against the general good to be subserved by the early completion of the bridge, still it is a right, no matter how small it may be, that must receive the full measure of protection afforded by the law, and it is a right of which plaintiffs can be divested alone in the manner provided by the law. I am sure no one, after a full investigation of this whole question, will ask that plaintiffs' rights be taken from them without authority of law. The motion to dissolve the injunction, and the demurrer to the bill, will be overruled.